UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
J. FREDERICK MOTZ
UNITED STATES DISTRICT JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
(410) 962-0782
(410) 962-2698 FAX

June 8, 2005

Memo To Counsel Re: Charles Cole, Jr., et al. v. M&T Bank Corp.
Civil No. JFM-04-2373

Dear Counsel:

    As I indicated at the conclusion of the hearing held on May 10, 2005, my present schedule is quite pressing. Therefore, I am not writing an extensive opinion in connection with the pending cross motions for summary judgment but, instead, am ruling upon them in this short memorandum to you.

    The case turns on the question whether "termination," as used in the amendments to the employee benefit agreements ("EBAs") adopted in 1989, includes terminations at any time (as argued by plaintiffs) or only terminations that might occur prior to defendant fulfilling its obligations under the Executive Life Plan ("ELP") agreements that were entered into simultaneously with the adoption of the EBA amendments (as argued by defendant). Plaintiffs are correct in contending that the language of the EBA amendments does not expressly limit the word "termination" in any way. However, defendant is correct in contending that when the EBA amendments are viewed in the context of the purpose of the series of transactions between the parties in 1989, reason and common sense dictate the conclusion that "termination" does not cover a termination that occurred after defendant met its obligation under the ELP agreements.

    Various documents, including the report of the bank's management committee to the bank's board, the resolutions adopted by the board dated October 17, 1989, and the EBA amendments themselves, make clear that the life insurance coverage provided under the EBAs was to be *replaced* by the life insurance coverage provided under plaintiffs' Executive Life Plan ("ELP") agreements. The possibility existed, however, that defendant would fail to fulfill its share of the bargain under the ELP agreements, specifically its obligation to pay a large share of the premiums for the insurance provided under the ELP agreements for a substantial period of time (ten years for Cole, twelve years for Peters). Thus, it was necessary to protect plaintiffs in the event that this possibility came about. That protection was provided in the first sentence of paragraph 3 of the EBA amendments, which stated:

> Should the Corporation terminate the Executive Life Plan pursuant to
> the provisions of Section 11.02 of the Split Dollar Agreement entered
> into between the Corporation and The Executive effective January 1,

>1990, then the Executive's waiver of rights as specified in paragraph 2
>above concerning death benefits under the Employee Benefit
>Agreement shall be null and void as of the date of the termination of the
>Executive Life Plan, and the benefits under the Employee Benefit
>Agreement so waived shall be automatically reinstated.

During the course of the following years, defendant met all of its premium payment obligations under the ELP agreements. Indeed, in 1999 it decided to lengthen the term it would pay the premiums. It did so in order to benefit plaintiffs in two respects. First, based upon then applicable IRS regulations, it was thought that defendant's payment of premiums for fifteen years would protect plaintiffs (and other executives with ELP agreements) against possible adverse income tax benefits. Second, it had been projected at the time the ELP agreements were entered into that the cash value of the policies would be sufficient at the time defendant ceased making premium payments to provide $2,000,000 in insurance coverage to Cole, and $1,500.000 in insurance coverage to Peters, until age 95 without the payment of any additional premiums. Unfortunately, because of low interest rates during the years that the cash value on the policies were accumulated these projections were not realized. Defendant's decision to extend the number of years it would pay the premiums provided more time for the cash value of the policies to accumulate.[1]

In November 2003 - long after its obligations to pay premiums for plaintiffs under the ELP agreements had expired - defendant decided to terminate the ELP. Again, it did so, at least in part, because of a concern that continuation of the ELP would subject plaintiffs (and other executives with ELP agreements) to adverse income tax consequences. According to new IRS regulations adopted in September 2003, ELP participants henceforth would have been taxed annually on the imputed income attributable to the interest on the loan represented by defendant's annual premium payments or would have been taxed on the cash surrender value exceeding their own contributions if a roll out or exchange of their policies occurred after December 31, 2003. By terminating the ELP in November, defendant met the December 31st "safe harbor" date.[2]

---

[1] It is the failure of the ELP policies to perform as projected that apparently is an underlying cause of plaintiffs' discontent. They have pointed to documents reflecting that the parties anticipated interest rates sufficiently high to meet the premium-free $2,000,000 and $1,500,000 value projections. However, plaintiffs have not chosen to bring an action for misrepresentation, and there is nothing in the ELP documents that promises that any particular projection would be met. Morever, plaintiffs were sophisticated bankers, and the relationship between interest rates and policy performance certainly was obvious to them.

[2] Plaintiffs argue that another motivation leading to termination of the ELP was defendant's desire to eliminate any program inconsistent with the benefits it was then offering to other executives throughout what by 2003 had become a large banking empire. The timing of the termination of the ELP (shortly before expiration of the IRS safe harbor date) and defendant's continuation of other programs that were inconsistent with its uniform benefits appear to refute this argument. Assuming, however, that plaintiffs have raised a genuine dispute of fact on the question, the dispute is immaterial because,

2

When the ELP agreements were terminated, plaintiffs used the cash value of the insurance policies for which premiums had been paid under the agreements to purchase individual policies of their own. Although Cole and Peters complain that these policies do not provide the benefits that were projected when the ELP agreements were made - premium-free coverage until age 95 in the amounts of $2,000,000 and $1,500,000, respectively - the benefits are substantial ones. They also significantly exceed the benefits provided under the EBAs that were replaced by the ELP agreements. The amounts of the life insurance coverage for Cole and Peters under the EBAs were $1,000,000 and $500,000, respectively. According to defendant, the benefits plaintiffs' heirs will receive through the policies purchased by plaintiffs with the cash value of the policies provided under the ELP agreements are slightly under $2,250,000 for Cole and over $1,000,000 for Peters. While plaintiffs may disagree with these figures in some respects, they have made no showing that what their heirs will receive are not well above what they would have received under the EBAs. Moreover, whereas the benefits payable under the policies provided under the EBAs were taxable, the benefits under the new policies are tax-free. Indeed, assuming a 35% tax bracket, even the cash value of the ELP policies at the time of defendant's termination of the ELP (approximately $700,000 for Cole and approximately $390,000 for Peters) exceeded what their beneficiaries would have received, after taxes, under the EBA policies.

Against this background, it is apparent that to read the word "termination" in paragraph 3 of the EBA amendments without regard to context and to find that it encompasses terminations that occur after defendant has met all of its obligations under the ELP agreements would result in a tremendous windfall to plaintiffs. Such a windfall would be entirely unjustified by the purpose of the clause in which the word appears: to protect plaintiffs in the event that defendant failed to perform under the ELP agreements. Morever, the unsoundness of plaintiffs' position is manifested by its implications. Under their argument, even if by the time the policies were rolled out and the ELP agreements were terminated, the cash values of plaintiffs' policies had accumulated to an amount sufficient to meet the coverage projections made at the time the ELP agreements were entered into, they would have been able to recover under the EBAs as well.

Under Maryland law a particular word or clause must be construed "in context with all of the language" in instruments comprising the parties' agreement. *See Stevenson v. Branch Banking & Trust Corp.*, 159 Md. App. 620, 652 (2004) (citing *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 301 (2004)). The true test of what contractual language means is "what a reasonable person in the position of the parties would have thought it meant." *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). For the reasons I have stated, application of these rules here requires that "termination" as used in paragraph 3 of the EBA amendments be construed as meaning only a termination occurring before defendant met its obligations under the ELP agreements that were entered into simultaneously with the execution of the EBA amendments. Accordingly, defendant's summary judgment motion will be granted, and plaintiffs' motion will be denied. A separate order to that effect is being entered herewith.

---

whatever defendant's motivation may have been, the termination occurred long after defendant had met its obligations to plaintiffs under the ELP agreements.

Despite the informal nature of this letter, it should be flagged as an opinion and docketed as an order.

Very truly yours,

/s/

J. Frederick Motz
United States District Judge

4